IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JONATHON BROWN,                          )
                                         )
        Petitioner,                      )
                                         )   No. 3:20-cv-00241
v.                                       )
                                         )   JUDGE RICHARDSON
BERT C. BOYD, Warden, and                )   MAGISTRATE JUDGE HOLMES
STATE OF TENNESSEE,[1]                    )
                                         )
        Respondents.                     )


**MEMORANDUM OPINION**

Jonathon Brown, an inmate of the Northeast Correctional Complex in Mountain City,

Tennessee, filed a pro se, in forma pauperis petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 challenging the legality of his confinement under a state court judgment in Robertson

County, Tennessee convicting him of aggravated rape, especially aggravated kidnapping, and theft

of property. (Doc. No. 3). Subsequent to filing his initial petition, Petitioner filed an amended

petition for writ of habeas corpus, asserting additional claims. (Doc. No. 20).

Presently pending before the Court is Respondent's answer to the amended habeas petition,

wherein he asks the Court to dismiss the petition. (Doc. No. 22).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C.

§ 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not

---

[1] Petitioner names Bert C. Boyd and the State of Tennessee as Respondents to this action. However, Habeas Rule 2 provides that the proper respondent is the "state officer who has custody" of the petitioner. The state officer who has custody of Petitioner at this time is the Warden of the Northeast Correctional Complex, Bert C. Boyd. Therefore, the Clerk will be directed to dismiss the State of Tennessee as a respondent to this action.

1

needed, and Petitioner is not entitled to relief. The petition therefore will be denied, and this action will be dismissed.

# I. PROCEDURAL HISTORY

The applicable procedural background is set forth in the appellate court opinion denying Brown's direct appeal, *State of Tenn. v. Jonathon D. Brown*, No. M2015-02457-CCA-R3-CD, 2016 WL 7030488 (Tenn. Crim. App. Dec. 2, 2016). Petitioner was convicted by a Robertson County jury of aggravated rape, especially aggravated kidnapping, and theft of property over the value of $1,000. *See id.* at *1. The trial court sentenced Petitioner as a career offender to an effective sentence of sixty years confinement. *See id*. at *1. The trial court ordered the sentences to be served concurrently in the Department of Correction. *See id*.

Petitioner filed a timely motion for a new trial, arguing that he was prosecuted in an improper venue, the evidence was insufficient for conviction, and the verdicts were against the weight of the evidence. *Id*. at *6. Following a hearing, the trial court denied his motion. *Id*.

Petitioner appealed, and Tennessee Court of Criminal Appeals affirmed his conviction and sentence. *See id*. Petitioner did not seek discretionary review before the Tennessee Supreme Court.

Petitioner subsequently filed a pro se petition for post-conviction relief in state court and, after the appointment of counsel, an amended petition. (Doc. No. 14, Attach. 14, at PageID 787-98, 817-19). After an evidentiary hearing, the post-conviction court denied relief. (*Id*. at PageID 829-50). On appeal, the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Jonathon D. Brown v. State of Tenn*., No. M2018-020255-CCA-R3-PC, 2019 WL 4034036 (Tenn. Crim. App. Aug. 27, 2019), *perm. app. denied* (Tenn. Jan. 15, 2020). The Tennessee Supreme Court denied discretionary review. *Id*.

2

On March 13, 2020,[2] Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the Eastern District of Tennessee. (Doc. No. 3 at PageID 19). By Order and accompanying Memorandum Opinion entered on March 20, 2020, the Honorable Thomas A. Varlan transferred the petition to this Court. (Doc. Nos. 7 and 8). By Order entered on May 19, 2020, the Court ordered Respondent to file an answer, plead, or otherwise respond to the petition. (Doc. No. 13). Respondent filed an answer on June 4, 2020. (Doc. No. 15). On August 14, 2020, Petitioner filed an amended petition for writ of habeas corpus, asserting additional claims. (Doc. No. 20). On September 25, 2020 Respondent filed an answer to the amended petition, wherein he concedes that the petition is timely and asks the Court to dismiss the petition. (Doc. No. 22).

In his petition, Petitioner asserts four claims for relief:

1. The trial court erred in allowing DNA evidence that (according to Petitioner) should have been excluded under Federal Rule of Evidence 403;

2. Petitioner received ineffective assistance of counsel;

3. Petitioner did not "agree to waive [a] statute of limitations defense on the plea offer" under *Rodriguez v. United States*, 933 F. Supp. 279 (1996); and

4. The State withheld material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

## II. SUMMARY OF THE EVIDENCE

The Tennessee Court of Criminal Appeals summarized the proof adduced during Petitioner's jury trial as follows:

---

[2] Under the "prison mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in *Richard v. Ray*, 290 F.3d 810, 812 (6th Cir. 2002) and *Scott v. Evans*, 116 F. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court. Here, the stamp on Petitioner's initial habeas petition indicates that he deposited the petition in the prison mail system on March 13, 2020, although the Clerk's Office did not receive and file the petition until March 17, 2020. Under the prison mailbox rule, the Court considers March 13, 2020, as the date of filing. In any event, Respondent concedes that Petitioner timely filed his petition. (Doc. No. 22 at PageID 1059).

3

At trial, Jason Ghee, a Drug Interdiction Officer for the 18th Judicial District Drug Task Force, testified that he was employed by the City of White House "to stop vehicles for valid traffic violations and try to disseminate if they are law-abiding citizens or if there is criminal activity afoot." On September 3, 2013, Officer Ghee was watching traffic drive north on I–65 and observed a green four-door Ford vehicle. Officer Ghee "initiated [his] emergency equipment" when he observed that the driver was not wearing a seatbelt and that the vehicle "crossed the lane of traffic twice." The green Ford vehicle exited I–65 onto Bethel Road and continued driving at speeds in "excess of ninety [miles per hour]." Eventually the vehicle "left the roadway" and crashed when it was unable to navigate a sharp turn in Bethel Road. After the vehicle crashed, Officer Ghee pulled into a nearby driveway and observed a black male wearing "[d]ark colored pants and [a] maroon shirt" exit the passenger side of the vehicle. Officer Ghee also saw another black male wearing "a white shirt and dark-colored pants and dark shoes" exit the vehicle and run in a southeasterly direction. Lastly, Officer Ghee observed a white female exit the car. The female and the male in the maroon shirt were apprehended within ten minutes of the crash. However, Officer Ghee was unable to apprehend the male in the white shirt, who Officer Ghee had observed driving the green Ford vehicle. Officer Ghee followed the man until the officer "came upon a large evergreen tree that [he] couldn't just run past without tactically clearing whether the person had a weapon or not ...." At that time, Officer Ghee informed the Millersville Police Department that he was in a "foot pursuit of a black male with dread locks wearing black pants and a white shirt." Officer Ghee noted that the victim's house was located in the direction where the male in the black pants and white shirt was traveling. Several hours after the green Ford crashed, Officer Ghee alerted Kentucky Highway Patrol Trooper David Hall to be on the lookout for "[a] dark colored Buick that [was] possibly headed towards Bowling Green."

Jerome Inmon testified that on September 3, 2013, he was driving from Nashville to Bowling Green, Kentucky with "a white girl and [his] cousin." Mr. Inmon did not know his cousin's name but referred to him as "Curly." Mr. Inmon identified the Defendant as "Curly" and stated that he was not actually related to the Defendant. Mr. Inmon stated that the Defendant was driving the green Ford vehicle on September 3 on I–65 when they were "spotted" by two police officers near Bethel Road. When the police officers initiated a traffic stop, the Defendant did not stop the vehicle because both Mr. Inmon and the Defendant believed that there were warrants out for their arrests. Mr. Inmon testified that the police chased them down Bethel Road until the green Ford vehicle hit a pole and the occupants jumped out and ran away. Mr. Inmon testified that he and the Defendant ran in different directions but that the police detained and arrested him. Mr. Inmon stated that he had criminal charges pending in Davidson County and had "a hold out of Kentucky" but that he did not accept any "deal" for testifying against the Defendant. Mr. Inmon stated that neither he nor the Defendant had ever previously been in the area of the car crash.

4

Next, H.N. testified that she had lived on Bethel Road in Robertson County for approximately forty-five years with her children and now-deceased husband. On September 3, 2013, H.N. drove to Goodlettsville to "run a few errands" and returned home by noon. When she arrived home, H.N. pulled her car into the garage located in the basement of her house. H.N. walked outside of the basement and filled up her lawnmower with gas. As she got on the lawnmower, a man "jumped out" from behind two of H.N.'s other vehicles parked next to the lawnmower. H.N. got off the lawnmower and tried to run away from the assailant, but "he came up behind [her] and stopped [her]" by holding a knife to her neck. H.N. testified that she tried to alert her neighbors by saying "help," but the assailant "pushed [her] back into the basement." The assailant told H.N. to be quiet, took her cars keys from her pants, and asked H.N. if she had any money. H.N. initially replied that she did not, but she then remembered she had placed two fifty-dollar bills in the trunk of her car. H.N. retrieved the two fifty-dollar bills from her car trunk and gave them to the assailant. Then the assailant got into the car and briefly turned on the ignition. By this time, the assailant had shut the garage door. The assailant also took off his shirt, opened the "passenger side door," and tossed his shirt into the car. He told H.N. that "he bet [she] had money upstairs." H.N. told the assailant that the door from the basement to the house was locked and that she did not have the key. However, H.N. had laid her house keys in the tray of an old dishwasher in the basement before leaving to run errands that morning. The assailant attempted to get into the house by climbing the steps and bringing H.N. up the steps, but H.N. told the assailant that she was locked out of her house and that her children were bringing her keys to the house around 3:30 p.m.

After he was unable to get into the house, the assailant came back down the steps and pushed H.N. against the vehicle while standing behind her. The man "unzipped [her] blue[ ]jeans and pulled them down." The assailant then pushed H.N. "around to the hood of the car" as H.N. said "I am so old, please don't do this to me." The assailant responded that her age did not matter. H.N. then felt the assailant penetrate her vagina with his penis several times, causing her pain. Additionally, the assailant put a garbage bag in her mouth to gag her. The assailant then pulled up his pants and H.N.'s pants, pushed her over to a "yard chair" in the basement, and tied her to the chair while she was still gagged with the garbage bag. H.N. recalled that the assailant used ski ropes hanging on the walls of the garage to tie each of her arms and legs to the chair, and he used "binder twine" to tie her waist to the chair. As the assailant "was getting ready to leave," H.N. was able to see his face. H.N. saw that the assailant was a black male with a short, stocky build and that his hair was in dreadlocks. However, H.N. was unable to positively identify the Defendant as the assailant at trial.

H.N. testified that, after the assailant tied her to the chair, he took a bottle of water and some rubber gloves that she had worn earlier that day to pull weeds. H.N. stated that the assailant put the gloves on before he left in her vehicle. H.N. testified that, before the assailant took her car, there were no gloves or knives in the vehicle.

5

After the assailant left in her vehicle, H.N. was able to free her hands, move over to a phone on the garage wall, and call her son, daughter, and son-in-law. After her family members arrived, they helped H.N. to free herself from the chair and called the police. Family members gave the police the license plate number of H.N.'s stolen car and took H.N. to the hospital. H.N. testified that the assailant gave her a small cut on her cheek with his knife and that she sustained bruising on her wrists from being tied to the chair. Additionally, H.N. stated that her vaginal area was "hurting really bad" following the assault. At the hospital, the emergency room doctor examined H.N. and performed a "rape kit." While she was at the hospital, H.N. became nauseous. The doctor performed an arteriogram on H.N. and determined that she had suffered a "stress related heart attack." On cross-examination, H.N. noted that she did not have any blockages in her heart and that she does not take any medications.

Cynthia Elder testified that on September 3, 2013, she was leaving her house for work when she noticed that she had missed a call from her mother, H.N. On her way to her car, Ms. Elder received a call from her husband, and she then drove to H.N.'s home. Once she arrived at H.N.'s house, Ms. Elder saw that H.N. "was sitting at the back of the basement next to the wall in a yard chair tied up." Ms. Elder saw that H.N.'s arms, legs, and waist were tied to the chair but that H.N. had loosened the restraints around her arms. Ms. Elder called the police and noticed that H.N.'s car was missing from the garage. The missing car was a black 1990 Buick Regal with a "Titans mirrored license plate" on the front of the car. After the police arrived, Ms. Elder, her uncle, and her brother cut the rope around H.N.'s waist and took her to the hospital. Ms. Elder testified that H.N.'s car was later found, and Ms. Elder and her husband sold the car for H.N. for $1,800.

Dr. Duane Harrison testified that he had been an emergency room physician for thirty-one years and had worked at the Hendersonville Medical Center for twenty-four years. After the trial court declared him an expert in emergency medicine, Dr. Harrison testified that he was working in the emergency room on September 3, 2013, and examined H.N. Dr. Harrison testified that H.N. stated that "she went out to mow her grass and someone attacked her," raped her, and held a knife to her throat. During his examination of H.N., Dr. Harrison noted that the bruises around her wrists "looked like constriction marks ...." Dr. Harrison stated that the bruises were fresh and were consistent with being "held or tied up ...." Dr. Harrison also performed "an in-depth vaginal exam" and found "[e]xternal bruising on [H.N.'s] external vagina." Dr. Harrison also found that H.N. "had tearing on the right external lip [,] ... bruising on both lips[,] ..." and bruising on her clitoral hood. Dr. Harrison testified that this bruising and tearing was consistent with "some type of trauma" and penetration. Dr. Harrison noted that the bruising would have been caused by "a violent act" that was consistent with "repeated penetration." Additionally, Dr. Harrison stated that due to H.N.'s age, "... if the act is just done in a violent manner, then she has dry thin tissue from being seventy-two years of age and it is torn if she is penetrated violently [,]" which would cause pain.

6

After taking a specimen from H.N.'s vaginal area, Dr. Harrison gave H.N. two different medications for nausea. When H.N. continued to feel nauseous, Dr. Harrison gave her "an anxiolytic," but H.N.'s blood pressure began to drop so he admitted her to the hospital overnight. H.N. was taken to the critical care unit, where the hospital staff "drew cardiac enzymes to determine whether or not something was wrong with her heart." Dr. Harrison found that H.N. had suffered a heart attack due to the stress of the earlier events. Dr. Harrison testified that these types of heart attacks are life-threatening and could cause organ failure.

Kathy Cormier testified that she was a registered nurse employed at Hendersonville Medical Center. On September 3, 2013, Ms. Cormier assisted Dr. Harrison in examining H.N. and processing a rape kit. Ms. Cormier testified that she assisted by "removing [H.N.'s] clothing in a specified way, packing her clothing, drawing blood, packaging her blood and sealing everything, [and] obtaining pubic hairs[.]" David Hall testified that he was a K–9 Trooper with the Kentucky State Police. On September 3, 2013, Trooper Hall was on patrol with Officer Jeremy Duvall when Officer Ghee contacted him. Based on the call from Officer Ghee, Trooper Hall began looking for a stolen "black '90s Buick" with a Tennessee Titans personalized plate. Trooper Hall drove to "the area of Gordon Avenue and Veterans' Memorial in Bowling Green, Kentucky" with Officer Duvall. Officer Duvall parked at the intersection of Veterans' Memorial and Gordon Avenue "facing a Junior Food Store" while Trooper Hall drove around the area.

After approximately ten minutes, Officer Duvall contacted Trooper Hall on the radio. Trooper Hall arrived at the Junior Food Store and saw a car matching the description of the stolen vehicle. Trooper Hall "set up surveillance," and the Defendant came out of the Junior Food Store and began to walk towards the stolen vehicle. However, when a "marked Bowling Green police cruiser" pulled into the parking lot for an unrelated reason, the Defendant "turned around and walked back into the store." At that point, Trooper Hall "ran into the store and immediately detained [the Defendant]." When Trooper Hall entered the store, the Defendant was lying in a "prone position in the floor of the Junior Food Store." Trooper Hall placed the Defendant in handcuffs and walked with him outside to the stolen vehicle. Trooper Hall then "patted [the Defendant] down for weapons and searched his pockets." Trooper Hall found "various change and currency[,]" "a small amount of marijuana[,]" and "car keys that appeared to go to [the stolen vehicle]." After Trooper Hall informed the Defendant of his Miranda rights, the Defendant agreed to speak with Trooper Hall and "stated that he had just bought the vehicle approximately one hour ago." However, the Defendant could not tell Trooper Hall the seller's name, and he "stated he technically did not buy it legally ...."

Officer Jeremy Duvall testified that he was a patrol officer for the Kentucky State Police and assisted Trooper Hall with locating a stolen vehicle on September 3, 2013. Officer Duvall testified that he had received an alert bulletin from Tennessee authorities regarding a stolen car that stated that the vehicle was "a 1990 black Buick two-door, Tennessee license plate[ ] with a silver mirrored style Tennessee

7

Titans front license plate." Officer Duvall stated that he parked his marked patrol car "at the intersection of Kentucky 185 and Veterans Avenue in Bowling Green ...." While he was parked at the intersection, Officer Duvall observed "a vehicle approaching [his] location with [a] silvered mirrored Tennessee Titans license plate ...." As the vehicle passed him, Officer Duvall noticed that the only occupant was "a single black male ... with a hat turned backwards and a white shirt." Officer Duvall also noticed that the license plate on the vehicle matched the license plate of the stolen vehicle from the Tennessee alert bulletin. The vehicle pulled into the parking lot of the Junior Food Store and parked, and Officer Duvall contacted Trooper Hall. After Trooper Hall arrived, he and Officer Duvall walked towards the store. The Defendant exited the store but turned around and walked back towards the store when a marked patrol cruiser pulled into the parking lot. Trooper Hall then commanded the Defendant to stop. The Defendant entered the store, laid "on the ground with his hands up," and was handcuffed. After arresting the Defendant, Officer Duvall and Trooper Hall searched the Defendant and found an unopened pack of cigarettes and seventy-eight dollars in the Defendant's pant pocket, among other items. Officer Duvall noted that the Defendant was wearing blue jeans, a white, long-sleeved thermal shirt, and black shoes when he was arrested.

Lieutenant John Brown of the Millersville Police Department testified that on September 3, 2013, he went to H.N.'s home on Bethel Road to investigate the crime scene. After he arrived, Lieutenant Brown spoke with H.N. and photographed the scene. Lieutenant Brown photographed some footprints "located to the right side of the basement garage area." The photographs of the footprints were submitted to the Tennessee Bureau of Investigation (TBI) along with the Defendant's shoes. Lieutenant Brown testified that he also processed the scene for latent fingerprints and "found a fingerprint or partial print maybe off of one of the other vehicles that was parked in the carport area." After processing the scene, Lieutenant Brown went to the Hendersonville Medical Center to receive a "sexual assault evidence collection kit."

On September 4, 2013, Lieutenant Brown processed the outside of the stolen vehicle for latent prints and evidence. Lieutenant Brown found "a series of smear marks" on the hood of the car near the front passenger wheel well. Lieutenant Brown searched the inside of the car and found a pair of clear latex gloves "in the front passenger side floorboard." Lieutenant Brown also found a "white type of undershirt" and a "box cutter knife" in the floorboard of the front passenger seat. In November 2013, Lieutenant Brown obtained a sample of the Defendant's DNA under a search warrant issued by a Kentucky court.

Jennifer Spivey stated that she was a Special Agent Forensic Scientist in the Latent Print Unit of the TBI Nashville Crime Laboratory. After the trial court declared that Special Agent Spivey was an expert in latent print examination, she stated that she examined a knife related to the Defendant's case for latent prints. She did not find any latent prints on the knife but did find "handling" or ridges of a print. Special

Agent Spivey also examined the latent print lifted by Lieutenant Brown, but she only found a few ridges and was unable to identify the latent print.

Mairanda Gaddes testified that she was a Special Agent Forensic Scientist in the Trace Evidence Unit of the TBI Forensic Services Division. After the trial court declared Special Agent Gaddes an expert in the examination of shoe prints, she stated that she examined the pair of boots worn by the Defendant and the photograph of the footprints on the floor of H.N.'s basement garage. Special Agent Gaddes testified that she was unable to properly compare the Defendant's shoes and the footprints in the photographs because "the wrong type of rule[r] was used." However, Special Agent Gaddes visually compared the tread of the Defendant's shoes with the footprints in the photograph, and stated that "they ha[d] a similar tread design." Special Agent Gaddes could not exclude the Defendant's shoe from being the shoe that created the footprint in the garage, but she also could not state with certainty that the Defendant's shoes made the footprints in the photograph.

Charly Castelbuono testified that she was a Special Agent Forensic Scientist in the Forensic Biology Unit of the TBI. After the trial court declared Special Agent Castelbuono to be an expert in DNA analysis, she stated that she examined the sexual assault kit with samples from H.N. Special Agent Castelbuono testified that the kit contained a "known blood sample" from H.N. and buccal swabs from the Defendant. Special Agent Castelbuono used the Defendant's buccal swabs to obtain a DNA profile of the Defendant for comparison purposes. Special Agent Castelbuono stated that she tested the shirt found in H.N.'s car for DNA and found DNA around the collar and armpits of the shirt. The DNA contained a "full profile" but was a mixture of DNA from multiple individuals. The Defendant was a major contributor of the DNA.

Special Agent Castelbuono also examined the Defendant's underwear and found semen as well as non-semen DNA. Special Agent Castelbuono testified that the partial DNA profile from the semen DNA matched the Defendant. Additionally, Special Agent Castelbuono stated that the partial DNA profile obtained from the non-semen DNA was "consistent with a mixture of at least three individuals." Special Agent Castelbuono testified that H.N. could not be excluded as a contributor to the mixture of non-semen DNA. Special Agent Castelbuono examined the latex gloves found in H.N.'s car by swabbing the inside and the outside of the gloves. She found a partial DNA profile on the outside of the first glove that was "consistent with the mixture of at least two individuals." H.N. was a major contributor to this DNA profile. Special Agent Castelbuono testified that her analysis was inconclusive as to whether the Defendant was a minor contributor to the DNA profile on the outside of the first glove. Next, Special Agent Castelbuono stated that she found a partial DNA profile on the inside of the first glove that was consistent with a mixture of H.N.'s DNA and the Defendant's DNA. Special Agent Castelbuono testified that she found a partial DNA profile on the outside of the second glove that was consistent with a mixture of H.N.'s DNA and the Defendant's DNA. Lastly, Special Agent Castelbuono testified that she found a

partial DNA profile on the inside of the second glove that was "consistent with a mixture of at least two individuals." Special Agent Castelbuono could not exclude either H.N. or the Defendant as a contributor to this DNA profile. Special Agent Castelbuono also tested the vaginal swab and H.N.'s underwear for semen but did not find any.

After the State rested its case, Chris Traughber testified that he was the property assessor for Robertson County. Mr. Traughber identified a property record card for H.N.'s residence on Bethel Road, and he noted that the card indicated that the property was located in Sumner County. Mr. Traugher also identified an aerial photograph and a "GIS map" of the portion of Bethel Road where H.N.'s residence was located. Mr. Traughber noted that the area was located in Sumner County. Mr. Traughber testified that H.N. would have paid her property taxes to Robertson County because there was an agreement between Sumner County and Robertson County for the properties in that area to pay taxes to Robertson County. On cross-examination, Mr. Traughber agreed that his testimony was based on maps from his office and that he did not survey the area of Bethel Road where H.N.'s property was located.

In rebuttal, David Mark Palmer testified that he purchased H.N.'s property in September 2013. Mr. Palmer identified a certified copy of the warranty deed to the property and noted that the warranty deed was registered with the Robertson County Register of Deeds. Mr. Palmer also testified that the warranty deed reflected that the property was located in Robertson County. Mr. Palmer stated that he was registered to vote based on the address of the property in question and that he voted in Robertson County. Additionally, Mr. Palmer stated that he paid property taxes for the property in question to Robertson County. Lastly, Mr. Palmer testified that he changed the address on his driver's license to the property in question, and his driver's license was registered in Robertson County.

Ms. Elder was recalled and testified that she lived at the property in question on Bethel Road from the time she was in third grade until she was twenty-three years old. Ms. Elder testified that she attended Robertson County Schools from elementary through high school. Ms. Elder also noted that she registered her car in Robertson County and registered to vote in Robertson County.

The jury found the Defendant guilty of two counts of aggravated rape, two counts of especially aggravated kidnapping, and one count of theft of property over the value of $1,000.

*State v. Brown*, 2016 WL 7030488, at *1-6.

The Tennessee Court of Criminal Appeals summarized the proof adduced during

Petitioner's post-conviction proceedings as follows:

Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, an amended petition was filed.

At an evidentiary hearing, Petitioner recounted meeting with trial counsel three times before the start of trial. The first meeting was shortly after trial counsel was appointed to represent Petitioner, and the second meeting was a couple months following the first meeting. Petitioner testified that the third time they met was a couple days before trial and that trial counsel discussed trial strategy with Petitioner. Petitioner estimated that, in total, trial counsel met with him for less than three hours. Petitioner did not believe that the three meetings with trial counsel were adequate to form a strong defense. Petitioner stated that he provided trial counsel with names of witnesses that would be beneficial to Petitioner's defense. However, trial counsel failed to subpoena the witnesses, and only one witness, the mother of Petitioner's child, showed up to testify.

Petitioner recalled that the State's plea offer was for a twenty-five year sentence with sixty-percent release eligibility. Trial counsel informed Petitioner that, if he proceeded with trial, he could receive a sixty-year sentence. Petitioner admitted that trial counsel advised him to take the State's plea offer, but Petitioner testified that he was not comfortable pleading guilty. He agreed that trial counsel discussed the State's evidence with him prior to trial. Petitioner contended that, while trial counsel explained that DNA evidence would be used against Petitioner, trial counsel did not adequately cross-examine Agent Castelbuono about the DNA evidence found on the gloves in the victim's car. Petitioner explained:

> I told [trial counsel] that I had been playing basketball that day. I had [taken] off a wife beater and was sweating, and I sat it at the bottom of the floorboard in a car that I had just bought. And the gloves were sitting down at the bottom of the car, so when the police [caught] me, they g[o]t the t-shirt and they g[o]t the gloves and that's how my DNA was inside the gloves.

Petitioner testified that trial counsel failed to raise this defense at trial.

Petitioner testified that trial counsel advised him not to testify at trial and that he followed counsel's advice. He stated, however, that he regretted his decision not to testify. Petitioner said that he had never worn braids or dreadlocks but that witnesses had described the assailant as having braids or dreadlocks. Petitioner stated that trial counsel never addressed this issue during trial. Petitioner asserted that Mr. Inmon originally identified someone else as the driver of the vehicle on September 3, 2013, and that trial counsel failed to question Mr. Inmon about his conflicting statements. Petitioner said that he did not find out about the conflicting statements until after trial. Petitioner further testified that trial counsel failed to subpoena or question the "white girl" who was in the vehicle with Mr. Inmon.

Petitioner acknowledged that trial counsel informed him that he was a career offender. Trial counsel also discussed what the victim would say during her testimony at trial, but he failed to inform Petitioner that the victim had gone to the hospital. Petitioner acknowledged that trial counsel told him that Petitioner's DNA was found on gloves in the victim's stolen car and that the victim's DNA was partially matched to DNA found in Petitioner's underwear. Petitioner admitted that trial counsel made him aware of the evidence the State planned on using against him and that trial counsel was going to challenge venue as a defense.

Trial counsel testified that he had practiced criminal defense for more than thirty years before being assigned Petitioner's case. As part of his initial investigation into the case, trial counsel went to the scene of the wreck. Trial counsel decided to use venue as a defense after looking at the location of the wreck and the property where the victim was attacked. Trial counsel met with the Tax Assessor for Robertson County, who located the property card which listed the victim's property as located in Sumner County. Trial counsel recalled discussing the venue issue and the DNA evidence with Petitioner. Trial counsel stated that juries tended to accept DNA evidence, so there was little he could say while cross-examining Agent Castelbuono about the DNA findings.

Trial counsel could not recall how many times he met with Petitioner, but he testified that it was "at least three times." Trial counsel stated that he interviewed Mr. Inmon before trial and decided Mr. Inmon's testimony would not be helpful to Petitioner's defense because he identified Petitioner as the person driving the vehicle on September 3, 2013. Trial counsel attempted to locate the "white girl" in the vehicle with Mr. Inmon but stated he could not subpoena her to trial because she was in jail in Kentucky. Trial counsel told Petitioner that he had a right to testify, but he advised Petitioner not to testify because Petitioner had no evidence to back up his claim that he bought the victim's stolen car that day. Petitioner chose not to testify. Trial counsel stated that the only thing he would have done differently while working Petitioner's case was to hire a surveyor to further support the venue defense. He explained, however, that he did not pursue hiring a surveyor "because [he] thought that the Tax Assessor would be sufficient." Regarding the proof against Petitioner, trial counsel explained:

> [I]n theft of property cases, there is an inference that the person possessing it is the one that took it. So you had that inference within two hours of this car being stolen ... [Petitioner] is found in possession of that property. That's a big problem to overcome and then ... [H.N.'s] partial DNA had no business being ... in [Petitioner's] underwear[.] How do you overcome that?

Following the hearing, the post-conviction court denied relief in a written order, finding that Petitioner failed to establish that he received ineffective assistance of counsel.

*Brown v. State,* 2019 WL 4034036, at *3-5.

### III. STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v.*

*Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, to be cognizable, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). "In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the

lack of review." *Id.* at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can be used as cause for the underlying defaulted claim only if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The

15

Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

## IV. ANALYSIS

With these principles in mind, the Court will turn to the examination of the four claims raised in Brown's initial and amended petitions for habeas relief.

16

A.    RULE 403 CLAIM

Petitioner first alleges that the DNA evidence admitted at his trial[3] should have been excluded under Federal Rule of Evidence 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. (Doc. No. 20, PageID 1032).

Petitioner did not raise an evidentiary challenge to the introduction of DNA evidence before the state courts. *See Brown*, 2016 WL 70-30488, at *6-8; *Brown*, 2019 WL 4034036, at *5-7. By failing to present a federal constitutional claim based on the DNA evidence to the state courts, Petitioner procedurally defaulted the claim. He therefore cannot pursue his claim on federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged errors. Petitioner does not argue that he can satisfy the cause and prejudice requirement, and nothing in the record indicates that Petitioner can make a showing of a fundamental miscarriage of justice.

Moreover, even if Petitioner had exhausted this claim, the Tennessee Rules of Evidence—not the Federal Rules of Evidence—controlled the introduction of evidence during Petitioner's state criminal trial. A claim that the state courts misapplied Tennessee law is not cognizable in a federal habeas petition. *See* 28 U.S.C. § 2254(a) (a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on

---

[3] The prosecution introduced DNA evidence showing that Petitioner was a major contributor of DNA found on a shirt in the victim's car, Petitioner's DNA was found on a pair of gloves located within the car, and the victim's DNA was partially matched to DNA found in Petitioner's underwear. *See Brown*, 2019 WL 4034036, at *2,4-5.

the basis of a perceived error of state law."). Simply put, this Court cannot consider whether a state court admitted DNA evidence during Petitioner's trial in violation of Tennessee law.

However, irrespective of whether they comply with state law, state-court evidentiary rulings may "rise to the level of due process violations [if they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). The rulings must be "so egregious that [they] result [ ] in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "[C]ourts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id.* (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

Petitioner makes no argument, and the Court finds no evidence in the record, that any such infraction occurred here. Consequently, this claim must be dismissed as procedurally defaulted and, alternatively, as non-cognizable.

B.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Next, Petitioner alleges that he received ineffective assistance of counsel during his criminal trial and on appeal of the denial of his state court habeas petition. (*See* Doc. No. 3, PageID 11-12; Doc. No. 20, PageID 1032). Specifically, Petitioner alleges in his initial federal habeas petition that his trial counsel was ineffective for failing to (1) adequately meet with him prior to trial; (2) have an adequate trial strategy; and (3) ensure the integrity of the "adversarial process." (*Id.* at PageID 11-12). In addition to these claims, Petitioner alleges in his amended petition that his trial counsel was ineffective for failing to convey to the trial court that Petitioner was "mentally incapable of understanding the negotiated plea offer of twenty-five years." (Doc. No. 20, PageID

18

1031). He further alleges that post-conviction counsel was ineffective for failing to "timely submit the [state's] plea offer to the Rule 11 Application." (*Id.*, PageID 1032-33).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 686-87; *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Id.* at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly

deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted).

1.    Trial court's failure to meet with Petitioner more than three times prior to trial

Petitioner first contends that trial counsel was ineffective because he "only convened [with Petitioner] three times prior to trial." (Doc. No. 3, PageID 11). According to Petitioner, trial

20

counsel's actions "left the Petitioner in a less than comfortable state in which to proceed to trial" and demonstrates "client abandonment at a very high level at least." *Id.*

Petitioner raised this claim during his post-conviction proceedings. (Doc. No. 14, Attach. 14, Page ID 818). After an evidentiary hearing, the post-conviction court found that trial counsel was an experienced criminal defense attorney and credited his testimony "that he had adequately met with and prepared Mr. Brown for trial and discussed with him a trial strategy that included a venue defense." (*Id.* at PageID 849). By contrast, the post-conviction court found that Petitioner's post-conviction hearing testimony in certain material respects was not credible. (Doc. No. 14, Attach. 14 at 850).

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals began its analysis of this claim by setting forth the governing legal standard for claims of ineffective assistance of counsel. *Brown,* 2019 WL 4034036, at *5-6. Applying *Strickland* and its progeny, the state appellate court concluded that the evidence in the record supported the post-conviction court's conclusion that trial counsel's performance was not deficient:

> The record does not preponderate against the post-conviction court's findings. Although trial counsel could not recall exactly how many times he met with Petitioner, he testified that it was "at least three times." Trial counsel testified that he adequately discussed the evidence and trial strategy with Petitioner. Trial counsel stated that he had practiced criminal defense for more than thirty years before being assigned Petitioner's case. He explained that he decided to use venue as a defense after looking at the location of the wreck and the property where the victim was attacked. Trial counsel stated that he discussed the venue issue and the DNA evidence with Petitioner.
>
> Petitioner agreed that trial counsel discussed trial strategy with him and that he knew trial counsel was going to challenge venue as a defense. Petitioner acknowledged that trial counsel discussed potential outcomes from a trial. Trial counsel informed Petitioner that he was a career offender and that he could receive a sixty-year sentence. Petitioner testified that trial counsel discussed the State's evidence with him prior to trial; trial counsel explained the DNA evidence and discussed what the victim's testimony would be.

Petitioner has not shown deficient performance on the part of trial counsel.

*Id*. Regarding prejudice, the Tennessee Court of Criminal Appeals agreed with the post-conviction court that Petitioner had "failed to establish a reasonable probability that the result of the proceeding would have been different if trial counsel had spent more time meeting with him, especially in light of the overwhelming evidence against Petitioner." *Id*. at *6.

The state courts' findings, including its credibility assessments, were not unreasonable. The court "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." *Mitchell v. Mason*, 325 F.3d 732,737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes the state courts' credibility findings. *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2001). Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). A state court's credibility finding on a particular issue may be overturned by a habeas court only when "evidence on the issue[ ] raised . . . is too powerful to conclude anything but" that the trial court's finding was unreasonable. *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).

Here, the post-conviction court credited the testimony of trial counsel and found Petitioner's testimony not credible. Petitioner has not identified any evidence to rebut this credibility determination.

The state courts' determination that trial counsel's performance was not constitutionally deficient was not based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland's* standards to those facts. The record showed that trial counsel had served as an assistant public defender for twenty-six years and, prior to that, had been in private practice

22

with the bulk of his practice consisting of criminal defense. (Doc. No. 14, Attach. 14, PageID 842). At Petitioner's post-conviction evidentiary hearing, trial counsel testified that he met with Petitioner at least three times and felt he had adequately covered the proof, DNA evidence, and trial strategy. (*Id*. at 843). He testified that he had discussed the DNA evidence with Petitioner "and explained that there were sometimes 'facts beyond change' and the DNA evidence was one of those facts." (*Id*. at 842). Petitioner has not demonstrated that trial counsel's actions as described constituted deficient performance.

Even if Petitioner had established that trial counsel's failure to meet with Petitioner more than three times was constitutionally deficient, the state courts' conclusion that Petitioner had not demonstrated prejudice as a result of trial counsel's failure was not an unreasonable application of clearly established federal law, nor was it based upon an unreasonable application of the facts in light of the evidence before the state court. This claim is without merit and will be dismissed.

2.  Trial counsel's failure to "have an adequate trial strategy"

Petitioner next asserts that his trial counsel was ineffective because he failed to "have an adequate trial strategy." (Doc. No. 3, PageID 11). Specifically, Petitioner asserts that his trial counsel should have done a better job of consulting with him and "keep[ing] [him] informed of the important developments," and should have "investigated the availability of other 'witnesses.'" (*Id*. at PageID 11-12). Petitioner asserts that "[i]t is unclear upon review of the trial, post conviction hearing and throughout the trial counsel's representation of the Petitioner[] of what strategy was employed at all." (*Id*. at 11).

Petitioner did not raise this claim in his petition for post-conviction relief and has never presented the claim to any state court. The time for raising the claim in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn. Code Ann. §§ 40-30-102(a), (c) (setting one-year

limitations period for post-conviction relief). He is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising the claim at this time. Petitioner cannot now return to the state courts to properly exhaust this allegation of ineffective assistance due to the expiration of the state statute of limitations on post-conviction actions and the "one petition" limitation on post-conviction actions. *See* Tenn. Code Ann. § 40-30-102(a) (statute of limitations); *id.* § 40-30-102(c) (one petition for state post-conviction relief). Therefore, Petitioner has procedurally defaulted this claim. *See Coleman*, 501 U.S. at 752-53.

To the extent that Petitioner argues that his post-conviction attorney's ineffectiveness provides cause to excuse the default, *Martinez* does not provide relief because the defaulted claim is not substantial; it does not have merit. 566 U.S. at 14. As he outlined, trial counsel's strategy was to challenge the trial venue. Trial counsel testified that, on at least three different occasions, he explained this strategy to Petitioner as well as the damning effect of the DNA evidence on his case. Petitioner agreed that trial counsel discussed trial strategy with him and that he knew trial counsel was going to challenge venue as a defense. *See Brown*, 2019 WL 4034036, at *6. On cross examination, when asked if he would do anything differently if he were to try the case again, trial counsel explained that "he thought the venue defense was very strong . . . he believed he just overestimated the jury regarding that defense." (Doc. No. 14, Attach. 14 at PageID 844).

Petitioner has not established that trial counsel's defense strategy was constitutionally deficient. It is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion." *Dixon v. Houk*, 737 F.3d 1003, 1012 (6th Cir. 2013). In order to fairly assess an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[S]trategic choices

made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690.

Although Petitioner references "important developments" and "other witnesses," he does not identify these developments or witnesses. Nor does he explain how the outcome of his trial would have been different had trial counsel kept Petitioner better informed or investigated other unidentified witnesses. The Sixth Circuit has instructed that, when "one is left with pure speculation on whether the outcome of [the criminal proceeding] could have been any different, [there is] an insufficient basis for a successful claim of prejudice." *Baze v. Parker*, 371, F.3d 310, 322 (6th Cir.2004*), cert. denied*, 544 U.S. 931 (2005).

This claim is not substantial, and Petitioner has not shown that he was prejudiced by post-conviction counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default of this claim. The claim, like the first, is without merit and will be dismissed.

3.     Trial counsel's failure to ensure the integrity of the adversarial process

Petitioner also contends that trial counsel was ineffective for failing to ensure the integrity of the adversarial process. (Doc. No. 3, PageID 12). According to Petitioner, under the Sixth and Fourteenth Amendments, "the adversary process is protected," and trial counsel should have guarded against any violations of "those amendments." (*Id*.)

Because Petitioner has never fully and fairly presented this claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. Thus, federal habeas review of the claims is barred unless Petitioner can demonstrate that cause and prejudice will excuse the

procedural default or that failure to consider the claims will result in a fundamental miscarriage of justice. *See Harris*, 489 U.S. at 262.

To the extent that Petitioner argues that his attorney's ineffectiveness provides cause to excuse the default, *Martinez* does not provide relief because the defaulted claim is not substantial. 566 U.S. at 14. Petitioner does not provide any details in support of this vague claim. Petitioner merely asserts that, "as seen with a simple review of the record in case at hand, the adversarial process was definitely broken in this case" without providing examples or citing to any particular portion of the record. (*See* Doc. No. 3, PageID 12). Without more, Petitioner cannot show that trial counsel's performance was constitutionally deficient. Consequently, Petitioner cannot show that his underlying ineffective assistance claim is substantial, and he is unable to establish cause and prejudice to excuse his procedural default of this claim. The petitioner is not entitled to relief on this claim, and the claim will be dismissed.

   4.   Trial counsel's failure to notify the trial court that Petitioner was incapable of understanding the plea offer

Next, Petitioner contends that trial counsel was ineffective in failing to convey to the trial court that Petitioner was "mentally incapable of understanding the negotiated plea offer of twenty-five years." (Doc. No. 20, PageID 1031). Petitioner did not raise this claim on direct appeal, in his petition for post-conviction relief, or on appeal of the denial of his petition for post-conviction relief. By failing to present this claim to the state courts, Petitioner procedurally defaulted the claim. *See Coleman*, 501 U.S. at 752-53. He therefore cannot pursue his claim on federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged errors. *See Harris*, 489 U.S. at 262.

To the extent Petitioner relies on *Martinez* to excuse his default, his claim that he was mentally incapable of understanding the plea offer is not substantial. At his post-conviction evidentiary hearing, the court and counsel asked Petitioner about the prosecution's settlement offer:

> Q Alright, in discussing the case with Mr. Goodlett were there ever any offers from the State for you to consider?
>
> A Yes sir, only one.
>
> Q Do you remember –
>
> A Twenty-five years at sixty percent.
>
> THE COURT: Can I get you to speak up just a little bit. I know I am struggling, so others may be as well.
>
> PETITIONER: Yes, sir.
>
> Q (By Mr. Johnson) Was that communicated to you by Mr. Goodlett?
>
> A Yes, sir, it was.
>
> Q Did y'all discuss whether or not -- well, let me ask you this. Did he have an opinion or have some guidance for you as to whether or not you should have accepted that offer?
>
> A Yeah, yes sir.
>
> Q What did he say?
>
> A Basically telling me that I should accept the plea deal and if I was to go to trial, I would get way more time.
>
> Q Okay, and ultimately, that is what happened, is that correct?
>
> A Yes, sir.
>
> Q Did you give him a reason, did you tell him why you weren't comfortable accepting that plea?

27

> A Yes, sir.
>
> Q What was that?
>
> A I didn't want to accept a plea of guilty to something that I know I didn't do.

(Doc. No 14, Attach. 15, PageID 865-66). This exchange demonstrates that Petitioner recalled and understood the precise offer presented to him. Indeed, Petitioner explained to the court why he did not accept the offer. Further, on cross examination during his post-conviction hearing, Petitioner conceded that, prior to trial, trial counsel had advised him that he was facing a sixty-year sentence if convicted, reviewed Petitioner's range with him based on his prior convictions, and explained the "worst case scenario" with Petitioner. (*Id*. at 880). Thus, Petitioner cannot establish that trial counsel's "failure" to alert the trial court of Petitioner's alleged mental deficiency constituted deficient performance because Petitioner's own testimony showed that he understood the plea offer.

Even assuming *arguendo* that trial counsel performed deficiently, Petitioner has not shown that he was prejudiced by trial counsel not informing the court of Petitioner's alleged inability to understand the plea offer. Although Petitioner now alleges that trial counsel's failure prevented the trial court from learning that Petitioner did not understand the plea offer presented to him, Petitioner himself testified to the court about the plea offer and explained precisely why he did not accept the offer. Thus, even if trial counsel had informed the court as Petitioner insists he should have, there is no evidence that doing so would have had an appreciable effect on Petitioner's conviction and sentence. This claim is not substantial, and Petitioner has not shown that he was prejudiced by counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default. The claim is without merit and will be dismissed.

5.      Post-conviction counsel's failure to submit a timely plea offer

Finally, Petitioner contends that his post-conviction counsel was ineffective for failing to submit a timely plea offer. (Doc. No. 20, PageID 1032).

However, there is no constitutional right to effective assistance of post-conviction counsel. *Le Hurst v. Holloway*, No. 18-6328, 2019 WL 2537927, at *5 (6th Cir. Apr. 15, 2019); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013); *see also Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (holding that ineffective assistance by post-conviction counsel does not provide a separate ground for habeas relief)); *Lynn v. Donahue*, No. 1:14-cv-01284, 2017 WL 5930304, at *10 (W.D. Tenn. Nov. 30, 2017) (dismissing habeas claims based on alleged ineffective assistance of post-conviction attorneys). Consequently, Petitioner cannot claim constitutionally ineffective assistance of counsel in state post-conviction proceedings. *See Wainwright v. Torna*, 455 U.S. 586 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance). *See also Wallace v. Sexton*, 570 F. App'x 443, 454 (6th Cir. 2014) ("The Supreme Court has not recognized ineffective assistance of post-conviction counsel as a free-standing constitutional claim.").[4] This claim therefore must be dismissed as non-cognizable.

C.      *RODRIGUEZ* CLAIM

Petitioner next contends that he "didn't agree to waive the statute of limitations defense on the plea offer" pursuant to *Rodriguez v. United States*, 933 F. Supp. 279 (S.D.N.Y. 1996). (Doc. No. 20, PageID 1032).

Petitioner has never argued that the fact that he "didn't agree to waive the statute of limitations defense on the plea offer" necessitated relief on appeal before any state court. *See*

---

[4] By contrast, as noted herein, ineffective assistance of post-conviction counsel can, under certain circumstances, constitute adequate cause to excuse a procedural default of some other claim. But here Petitioner is asserting ineffective assistance of post-conviction counsel as an independent claim—which is not cognizable, as noted above.

*Brown*, 2016 WL 7030488 at *6-8; *Brown*, 2019 WL 4034036 at *5-7. Therefore, this claim is unexhausted and procedurally defaulted. *See Coleman*, 501 U.S. at 752-53. Petitioner has not asserted any cause or prejudice to excuse the default. *See Harris*, 489 U.S. at 262.

Even if Petitioner had not procedurally defaulted this claim, however, the claim is without merit. Petitioner asks the Court to vacate his sentence and impose a twenty-five year sentence, presumably because he received a plea offer of twenty-five years' incarceration prior to trial. (Doc. No. 20, PageID 1032). However, federal resentencing is not an available relief option for a state petitioner like Brown seeking federal habeas relief. Sentencing is a matter for the state courts and "states have authority over the administration of their criminal justice systems, including concurrent and consecutive sentencing." *Carrington v. Sloan*, No. 2017 WL 2456996, at *2 (N.D. Ohio June 6, 2017) (citing *Oregon v. Ice*, 555 U.S. 160, 164 (2009)); *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only." ); *see also Coleman v. Curtin*, 425 F. App'x 483, 484-85 (6th Cir. 2011) (holding that an assertion that state trial court improperly calculated petitioner's sentence under state law is not cognizable in federal habeas proceedings).

Moreover, *Rodriguez*—a decision out of the Southern District of New York—is not binding on this Court. Even if it were, the *Rodriguez* case has no relevance to the issues raised by Petitioner in this action. The *Rodriguez* case involved a defendant's challenge under 28 U.S.C. § 2255 to her conviction under 18 U.S.C. § 924(c). The issues raised in *Rodriguez* are not related to the issues raised in Petitioner's case. This claim will be dismissed.

D.   *BRADY* CLAIM

Finally, Petitioner alleges that the State violated *Brady* by failing to "reveal and extend all evidence admissible and useful to the defense." (Doc. No. 20, PageID 1032). Petitioner does not identify which admissible evidence he believes the State withheld.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). To establish a *Brady* violation, three conditions must be met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. Regarding prejudice, the Supreme Court has explained:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles,* 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

Petitioner did not raise a *Brady* claim on direct appeal, in his petition for post-conviction relief, or on appeal of the denial of his petition for post-conviction relief. Thus, he has never presented the claim to any state court, and the time for raising the claim in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn. Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief). Petitioner is now barred by the post-conviction

31

statute of limitations and restrictions on successive state petitions from raising the claim at this time.

Because Petitioner has never fully and fairly presented a *Brady* claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. However, a prosecution's suppression of *Brady* material can constitute cause for the failure to exhaust a *Brady* claim. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004). Thus, the Court will consider whether Petitioner has established cause for excusing the procedural default of his *Brady* claim.

Establishing cause and prejudice to excuse the default of a *Brady* claim "'parallel[s] two of the three components of the alleged *Brady* violation itself.'" *Banks*, 540 U.S. 668, 691 (quoting *Strickler*, 527 U.S. 263, 282). A petitioner demonstrates "'cause' when the reason for his failure to develop facts in the state-court proceedings was the State's suppression of relevant evidence." *Banks*, 540 U.S. at 691. A petitioner demonstrates prejudice "when the suppressed evidence is 'material' for *Brady* purposes." *Id*. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). And, as noted above, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

Here, Petitioner fails to demonstrate cause and prejudice to excuse his default because he has not established that the State suppressed relevant evidence and that the evidence was material.

Indeed, Petitioner does not identify the evidentiary basis for his *Brady* claim or explain how the State allegedly withheld evidence that would have undermined confidence in the outcome of his trial. *See Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (noting that petitioner has the burden of proving a *Brady* violation); *Burns v. Lafler*, 328 F.2d 711, 724 (E.D. Mich. 2004) ("Allegations that are merely conclusory or which are purely speculative cannot support a *Brady* claim.") (citation omitted). Finding no basis to excuse Petitioner's default of his *Brady* claim, this claim for relief must be denied.

## V.    CONCLUSION

For the reasons set forth herein, the petition filed by Petitioner Jonathon Brown seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El*, 537 U.S. at 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the court will deny a COA as to each claim.

An appropriate Order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE